UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KENNETH WILEY, et al.,

        Plaintiffs,

                                  CASE NO. 2:12-CV-00605
    v.                         JUDGE EDMUND A. SARGUS, JR.
                                    MAGISTRATE JUDGE NORAH M. KING

TRIAD HUNTER LLC, et al.

        Defendants.

## OPINION & ORDER

This matter is before the Court for consideration of competing motions for summary judgment. Plaintiffs move for summary judgment as to Count I of their Second Amended Complaint. Doc. 44. Two parties have countered with summary judgment motions of their own as to the same Count. Defendant Triad Hunter LLC ("Triad") submits a cross-motion for summary judgment, doc. 52; and Defendants Chesapeake Exploration, L.L.C. and CHK Utica, L.L.C. (collectively "Chesapeake"), which recently intervened in this matter, *see* doc. 126, have also moved for summary judgment, doc. 94. For the reasons below, the Court **GRANTS** Triad's cross-motion for summary judgment, **GRANTS** Chesapeake's motion for summary judgment, and **DENIES** Plaintiffs' motion for summary judgment.

## I. BACKGROUND

### A. Facts

The substantive facts underlying this matter are largely uncontested. Plaintiffs consist of a group of individual landowners from Noble County Ohio. From 2008 to 2010, Plaintiffs entered into a series of oil and gas leases (hereinafter "the Leases") with Anschutz Exploration Corporation ("Anschutz"). Doc. 43 ¶ 6. Anschutz subsequently assigned its interest in the

Leases to Chesapeake, doc. 44-5; and Chesapeake later assigned mineral rights at certain depths to Triad, doc. 44-7 at 2.

The Leases contain several provisions particularly important to the present conflict. First, the "Leasing Clause" provides that "Lessor hereby grants, leases and lets exclusively to Lessee all the oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased." Doc 44-2 ¶ 1. Second, the "Lease Term" explains that the lease "shall remain in force for a primary term"—some have a primary term of three years, *id.* ¶ 3, some of five years, doc. 78-2 ¶ 3. Third, the Leases contain several clauses that operate to extend the duration of the lease. The rest of the "Lease Term" clause, for example, provides that the lease "shall remain in force for a primary term" and:

> for as long thereafter as prescribed payments are made, or for as long thereafter as operations are conducted on the Leasehold in search of or production of oil, gas, or their constituents, or for as long as a well capable of production is located on the Leasehold or lands pooled or unitized therewith, or for as long as extended by provision herein. If after the primary term of the last producing well on the Leasehold or lands pooled or unitized therewith is plugged and abandoned, the Leasehold will remain under Lease for an additional period of one year from the date of plugging and abandonment, subject to the payment of delay rental.

Doc. 44-2 ¶ 3. As another example, some of the Leases contain a clause labeled "Extension of Primary Term." *See id.* ¶ 4. *But see* doc. 78-2 ¶ 4 ("Extension of Primary Term" clause crossed out). It confers to the lessee:

> the option to extend the primary term of this Lease for one additional term of **three (3)** years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor of the Lessor's credit an amount equal to **$60.00** per net mineral acre owned for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

Doc. 44-2 ¶ 4.

Fourth, and most importantly for the motions *sub judice*, the Leases contain a clause titled "Preferential Right to Renew" (referred to throughout as "Paragraph 14"). It reads in full:

> If, at any time during the primary term hereof, or within one (1) year from the expiration, cancellation or termination of this Lease, Lessor receives an acceptable, bona fide third-party offer to lease the Leasehold, in whole or part, Lessor shall promptly provide the Lessee, in writing, of all of the verifiable particulars of such offer. Lessee shall have thirty (30) days from the receipt thereof to advise Lessor, in writing, of its agreement to match said third-party offer as to all terms and consideration; immediately thereafter, Lessor and Lessee shall take all cooperative steps necessary to effectuate the consummation of said transaction and the survival of said transaction through any statutorily mandated right of cancellation thereof. Any lease or option to lease the Leasehold, in whole or part, granted by Lessor in contravention of the purposes of this paragraph shall be deemed null and void.

Doc. 44-2 ¶ 14; doc. 78-2 ¶ 14.

Plaintiffs have submitted one lease, that of Kenneth and Shelia Wiley, to support their motion. *See* doc. 44-2. To prove that the other twenty-three Plaintiffs indeed have a lease with the same language, one of Plaintiffs' attorneys submits an affidavit asserting that "[e]ach Plaintiff's lease contains an identical Paragraph 14." Doc. 44-8 ¶ 2. Neither Triad nor Chesapeake contests this point. Plaintiffs assert that the Wileys have received a bona fide offer to lease their land. *See* doc. 44-4. For support, they point to an unsigned oil and gas lease, with the Wileys' names filled in as the lessors and SWEPI LP filled in as the lessee. Doc. 44-3 at 2. Plaintiffs also aver, by way of an affidavit from one of their attorneys, that every other non-Wiley Plaintiff would like to obtain third-party offers for their land. *See* doc. 44-8 ¶ 4.

On October 24, 2011, counsel for the Wileys sent a letter to Anschutz. Doc. 44-4. The Wileys informed Anschutz that they had received a bona fide offer to lease their land, and that the offer exceeded the terms and conditions of the Wileys' original lease with Anschutz. *Id.* at 1. The letter references an attached copy of the offer; informs Anschutz that it had thirty days to meet or exceed the offer; and asserts that the failure to do so would terminate the lease. *See id.*

The letter made its way to Chesapeake Energy, which then responded with its own letter. Dated November 15, 2011, it informed the Wileys that: Chesapeake did not receive "any particulars regarding any third party offer" with the Wileys' letter; the company acquired the Lease by assignment in July 2010; the company disagreed with the Wileys' interpretation of the Lease; and, according to Chesapeake, the company had "no further obligations at this time pursuant to Paragraph 14" of the Lease. Doc. 44-5. The Wileys also sent a similar letter to Triad on March 7, 2012, with the only difference being to inform Triad that the lease had in fact been forfeited based on the Wileys' interpretation of Paragraph 14. Doc. 44-6. Triad responded on April 2, 2012 letting the Wileys know that the company disagreed with their interpretation of the lease, and that it viewed the lease as still in effect. Doc. 44-7. The company also attached an affidavit signed by one of its land managers, in conformity with Ohio Revised Code § 5301.332, asserting that the lease had not been forfeited. *See id.* Based on the record, at least one lease remains in its primary term. *See* doc. 78-2 ¶ 3. The Wileys signed their lease on October 30, 2008 with a primary term of three years. *See* doc. 44-2 ¶ 3. The parties seem to assume that all of the Leases are in the primary term or an extension of that term. *See* doc. 44; doc. 52; doc. 94-1 at 5.

**B. Procedural Background**

Plaintiffs brought this action in June 2012 in the Noble County Court of Common Pleas. *See* doc. 3. Triad removed the action to this Court in July 2012 on the basis of diversity jurisdiction. *See* doc. 1. Plaintiffs asserted the following claims against Triad: (1) a declaration that Triad's failure to match third-party offers would terminate and cancel the Leases under the terms of the "Preferential Right to Renew" provision; (2) a claim for declaratory judgment based on a violation of Ohio Revised Code § 1509.31, which requires notification of oil and gas lease assignments; (3) a cause of action for anticipatory breach and repudiation; (4) a claim of unjust

4

enrichment; (5) and a cause of action for slander of title.  *See* doc. 43.  Triad moved to dismiss several of the claims, *see* doc. 45, and now Counts 1, 3, and 4 remain.  Chesapeake moved to intervene as a defendant in the matter in May 2013, *see* doc. 80, and the Court granted its motion in August 2013, *see* doc. 126.

Both Triad and Chesapeake have asserted counterclaims in this case.  Triad brings a counterclaim for a declaratory judgment asking the Court to toll the primary term of the Leases "for such time as is necessary to litigate this matter through a final non-appealable judgment." Doc. 67 at 13.  Chesapeake asserts two counterclaims.  One seeks a declaratory judgment as to the meaning of Paragraph 14.  Doc. 165 at 13 ¶ 24.  The other seeks a declaratory judgment on several fronts: one asks the Court to toll the primary term of the lease until final resolution of this case, *id.* at 14 ¶ 33; another asks the Court to declare the "terms of the Leases are equitably extended by virtue of" Plaintiffs' suit, *id.* at 15 ¶ 34(a); and the final asks the Court to extend the terms of the Leases indefinitely pursuant to the Leases' force majeure clauses, *id.* at 15 ¶ 34(b); *see also* doc. 44-2 ¶ 11 (example of force majeure clause).  Chesapeake seeks further relief for both of its counterclaims in the form of costs and attorney fees.

As to the motions *sub judice*, Plaintiffs have moved for summary judgment as to Count 1 of their complaint, arguing that the failure to match bona fide offers or cancel the lease constitutes a material breach.  Doc. 44 at 20.  To counter, Triad filed a cross-motion for summary judgment on Count 1 arguing that Paragraph 14 is unambiguous and does not give Plaintiffs the right to terminate the leases.  *See* doc. 52 at 3.  Chesapeake also moves for summary judgment on Count 1 under the same theory as Triad.  *See* doc. 94-1.[1]

---

[1] Throughout the rest of this Order, the Court often refers to Triad's arguments with respect to Paragraph 14; the Court notes that Triad's and Chesapeake's arguments on this front closely track one another.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. DISCUSSION

#### A. Standing

As a preliminary matter, Triad raises a standing concern with respect to the non-Wiley Plaintiffs. The company points out that Plaintiffs seem to seek summary judgment, in the form of a declaratory judgment, on two fronts—first as to the proper interpretation of Paragraph 14, and second that this interpretation requires the Court to terminate the Leases. *See* doc. 52 at 20; doc. 55 at 11. Plaintiffs ask for a declaration that they may receive a third-party offer. *See* doc. 55 at 11. They also seek an order "from this Court terminating or cancelling their leases" for Triad's "[f]ailure to cooperate in matching the third-party offers," *id.* at 12. Triad points out that only the Wileys demonstrate that they have actually received a third-party offer. *See* doc. 52 at 20. Accordingly, argues Triad, the Court can render a judgment applying to all Plaintiffs as to the general interpretation of Paragraph 14; and, to the extent the Court agrees with Plaintiffs' Paragraph 14 argument, can only render a judgment applying to the Wileys as to the issue of terminating the Lease. *See id.*

For the purpose of proceeding to the merits of the summary judgment motions, it is enough that standing exists on several fronts. First, the Court has standing to interpret the contract language at issue as it pertains to the non-Wiley Plaintiffs. All parties ask the Court for a declaratory judgment as to Paragraph 14. Ohio law allows parties to seek declaratory judgment from a court to determine "question[s] of construction" under a contract. *City of Parma v. Cingular Wireless, LLC*, 278 F. App'x 636, 641 (6th Cir. 2008) (citing Ohio Rev. Code § 2721.03). The Declaratory Judgment Act, 28 U.S.C. § 2201, serves the same purpose in federal court. *See Blakely v. United States*, 276 F.3d 853, 872 (6th Cir.2002). But a federal court may only resolve an issue under the Declaratory Judgment Act when the parties present a justiciable controversy: "a substantial controversy, between parties having adverse legal interests, of

7

sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *City of Parma*, 278 F. App'x at 641 (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). These requirements apply here. The controversy is substantial—one side believes Paragraph 14 could entitle its members to cancel the lease, the other disagrees; as those on opposite sides of a contract, the parties have adverse legal interests; and one Plaintiff has received a third-party offer, while the others would like to solicit them.

Second, the Court confirms that standing exists with respect to the Wileys. Neither side contests as much. The Wileys have submitted support for the fact that they have a lease with Triad and that they have received a bona fide third-party offer. Further, they assert that Triad's refusal to match the offer breaches the terms of Paragraph 14. In short, a justiciable controversy clearly exists.

Third, standing as to the non-Wiley Plaintiffs' request to cancel all of the Leases is only an issue to the extent the Court agrees with Plaintiffs' interpretation of the contract. The Court declines to cross this bridge until it needs to do so. Thus, the Court now turns to the merits of the contract-interpretation dispute.

**B. The Motions for Summary Judgment**

Three motions for summary judgment stand before the Court, but they all seek a resolution of the same issue: the meaning of the "Preferential Right to Renew" clause in Paragraph 14 of the Leases. Thus, all of the motions hinge on the same central issue of law, specifically the legal meaning of one paragraph in a contract.

The parties dispute both whether the "Preferential Right to Renew" clause in Paragraph 14 is unambiguous and the ultimate effect of the clause's words. Plaintiffs seek a declaratory judgment that Paragraph 14 permits landowners to receive third-party offers at any time, *see* doc.

44 at 20; that a lessee must then either match the offer or cancel the lease regardless of whether the relevant Lease term has expired, *see id.*; and that, as applied to any Plaintiffs who have received bona fide offers, Triad's failure to match the offer or cancel the Leases constitutes a material breach of—and thus terminates—the Leases, *see id.* In response, Triad and Chesapeake argue that Paragraph 14 is unambiguous and does not give Plaintiffs the right to terminate the leases. *See* doc. 52 at 3; doc. 94-1.

As an important initial note, several recent cases have dealt with the exact same contract language at issue in this case. *See Chesapeake Exploration, LLC v. Catlett Quality Plumbing & Heating, Inc.*, No. 5:12CV188, 2012 WL 5364259 (N.D. Ohio Oct. 30, 2012); *Cain v. Chesapeake Exploration, LLC*, No. 5:12CV1699, 2012 WL 5996910 (N.D. Ohio Nov. 30, 2012); *Koonce v. Chesapeake Exploration, LLC*, No. 2012 CV 136 (Columbiana Cnty. Ct. Com. Pl. 2012) (consolidated with *Coniglio v. Chesapeake Exploration, LLC*, No. 2012 CV 27102 (Carroll Cnty. Ct. Com. Pl. 2012), and included in the record¸ *see* doc. 94-3).

The Court adopts the analysis of the above cases that have already decided the same issue as the one presented here, and it tracks particularly the analysis and conclusions of the *Catlett* Court. The *Koonce* Court and the *Catlett* Court generally came to the same conclusions, particularly with respect to the dispositive clauses for the purposes of this case. Both Courts held that Paragraph 14 allows the lessor to present an offer to the lessee; that the lessee then has a chance to match that offer; and that the lessee's failure to do so does not terminate the pre-exisiting lease. *See Catlett*, 2012 WL 5364259, at *4–5; *Koonce*, doc. 94-3 at 8–9, 11. In following the *Catlett* Court, the Court here first lays out the Ohio law guiding contract interpretation. Then, in order to resolve the parties' disagreement of interpretation, the Court progresses line-by-line through Paragraph 14.

**1. Contract Interpretation**

The parties do not dispute that Ohio contract law governs the interpretation of the contract. In interpreting a contract under Ohio law, the Court must "ascertain the intent of the parties." *City of St. Marys v. Auglaize Cty. Bd. of Comm'rs*, 115 Ohio St. 3d 387, 390, 875 N.E.2d 561, 566 (Ohio 2007). With respect to the terms in a contract, the law "presume[s]" the intent of the parties "to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313, 667 N.E.2d 949, 952 (Ohio 1996). When interpreting this language, words and terms "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Lo–Med Prescription Servs., Inc. v. Eliza Jennings Group*, No. 88112, 2007 WL 1290078, at *3–4 (Ohio Ct. App. May 3, 2007) (citing *Shifrin v. Forest City Enterprises*, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501 (Ohio 1992)). Where those terms "are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 115 Ohio St. 3d at 390, 875 N.E.2d at 566.

Accordingly, a court interpreting contract language must conduct a threshold inquiry: whether the language is, as a matter of law, ambiguous. *See Shifrin*, 64 Ohio St. 3d at 638, 597 N.E.2d at 501. The Ohio Supreme Court has articulated a test for ambiguity—"Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* And where, according to this test, the terms and language are "clear and unambiguous, . . . [a court's] interpretation is a matter of law and there is no issue of fact to be determined." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108, 652 N.E.2d 684, 686 (Ohio 1995).

Ohio courts have provided additional guidance for interpreting oil and gas leases, although the rules of interpretation and law are nearly the same as for any other contract. Like other contracts, "[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument." *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502, 506 (1897). A court's interpretation of contract language in an oil and gas lease is also a matter of law. *See Kramer v. PAC Drilling Oil & Gas, LLC*, 197 Ohio App. 3d 554, 558, 968 N.E.2d 64, 67 (2011); *Bath Twp. v. Raymond C. Firestone Co.*, 140 Ohio App. 3d 252, 256, 747 N.E.2d 262, 264 (2000).

### 2. The Provisions at Issue in Paragraph 14

#### a. "14. Preferential Right to Renew"

Plaintiffs argue that the title of the Paragraph 14 does little to inform its interpretation. Like their counterparts in *Catlett*, Plaintiffs cite *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St. 3d 238, 241, 513 N.E.2d 253, 256 (1987), for support. On the other side, Triad and Chesapeake argue that the heading can, if necessary, inform the meaning of the words within the provision. They cite the *Catlett* decision for support.

The Court agrees with the reading of *Worth* laid out in *Catlett*. *Worth* does not apply to the situation in this case. Rather, *Worth* held that the *absence* of a title does not determine the meaning of a contract provision. *Catlett*, 2012 WL 5364259, at *3 ("Thus, the *Worth* court noted that the lack of a heading was not dispositive. It did not hold that headings were irrelevant or should be ignored."). Further, "while the parties were free to negotiate, they did not negotiate a provision that stated that the headings were inserted for mere convenience and therefore should not be used in determining the parties' intent." *Id.* (citing *Sunoco, Inc. v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 402, 953 N.E.2d 285, 290 (2011)). This does not mean, as Plaintiffs argue, that

the title controls the entire meaning of the Paragraph 14.  Rather, because the Court "is bound to give meaning to *all* the words chosen by the parties," it means that the Court "will review the heading, if necessary, to interpret [Paragraph 14]." *Id.*

> **b. "If, at any time during the primary term hereof, or within one (1) year from the expiration, cancellation or termination of this Lease, Lessor receives an acceptable, bona fide third-party offer to lease the Leasehold, in whole or part, Lessor shall promptly provide the Lessee, in writing, of all of the verifiable particulars of such offer."**

The Court finds this part of Paragraph 14 unambiguous.  According to its plain language, it "allows [Plaintiffs] to present bona fide offers to [Triad] from the first day the lease is signed until up to one year beyond the expiration of the lease." *Catlett*, 2012 WL 5364259, at *3.

> **c. "Lessee shall have thirty (30) days from the receipt thereof to advise Lessor, in writing, of its agreement to match said third-party offer as to all terms and consideration;"**

The Court finds this provision unambiguous and no party argues otherwise.  It "grants [Triad] thirty days to match any offer received and presented by Defendants." *Catlett*, 2012 WL 5364259, at *3.

> **d. "[I]mmediately thereafter, Lessor and Lessee shall take all cooperative steps necessary to effectuate the consummation of said transaction and the survival of said transaction through any statutorily mandated right of cancellation thereof."**

The heart of the parties' disagreement lies in the above provision.  Plaintiffs argue that "said transaction" refers to their new agreement with the third-party offeror.  Thus, according to their argument, the language requires Triad to match the new agreement and, if it does not, to cancel the lease it currently has in place with Plaintiffs in order to "effectuate the consummation" of Plaintiffs' newly acquired offer.  In other words, Plaintiffs argue that they can accept a third-party offer, which would then terminate the existing Leases.  Plaintiffs take their argument one step further.  They argue that any failure "to effectuate" the new agreement, under their

12

interpretation of the phrase, constitutes a breach of Paragraph 14 and thus a breach of the lease. And because this would be a material breach, Plaintiffs argue, their Leases would be void.

Triad and Chesapeake counter with their own interpretation of the clause. They point out that the title attached to Paragraph 14—"Preferential Right to Renew"—informs the meaning of "said transaction." In other words, Plaintiffs can only "renew" a contract already existence, which would be their contract with Triad or Chesapeake. Thus, "said transaction" refers to the renewal of the current agreement between Plaintiffs and the lessee. Before even relying on the title of Paragraph 14, though, Triad and Chesapeake argue that the provision above is unambiguous—it allows the lessee to match another offer to lease the oil and gas rights for the land at issue if that offer comes during the temporal limitations provided; and failure to match is not a material breach of the contract. Finally, they point out that the courts to interpret this provision so far have held that this provision does not allow landowner–lessors to use a third-party offer to terminate an existing lease.

The Court finds the language of this provision unambiguous as well: it refers to if and when the lessee decides to match the third-party offer, not to the lessee's obligation to match the third-party offer or cancel the existing contract. First, a semi-colon connects the phrase "immediately thereafter" and the previous clause.[2] As explained above, the previous clause provides an explanation for how a lessee would go about matching a bona fide third-party offer. Thus, "immediately thereafter" refers to the time after the lessee has decided to match that third-party offer. This connection and context dictate the only logical meaning of "said transaction."

---

[2] Together, the clauses read:

Lessee shall have thirty (30) days from the receipt thereof to advise Lessor, in writing, of its agreement to match said third-party offer as to all terms and consideration; immediately thereafter, Lessor and Lessee shall take all cooperative steps necessary to effectuate the consummation of said transaction and the survival of said transaction through any statutorily mandated right of cancellation thereof.

Doc. 44-2 ¶ 14.

The "transaction" referred to in the provision can only be the agreement of the parties to match the third-party offer.

Second, several additional points reaffirm that the part of the provision starting with "immediately thereafter" and including "said transaction" refers to the renewal of the pre-existing contract. Again, the title leading into Paragraph 14 reads "Preferential Right to Renew." Just as in *Catlett*, Plaintiffs here "have gone on at length to argue that 'renew' can have any number of meanings," *Catlett*, 2012 WL 5364259, at *4, including one that leads to their desired end—"a renewal [that] can create a new legal relationship [with the third-party offeror] during the pendency of the former legal relationship," doc. 44 at 12. This argument defies the plain language and context of Paragraph 14, and it misses "the vital importance of the term 'renew' in the context of this provision—one can only renew something that is currently in existence." *Catlett*, 2012 WL 5364259, at *4. In short, "when the provision speaks of 'consummation of said transaction,' the sole logical interpretation is that 'said transaction' is the renewal expressly spoken of in the title of the provision." *Id.*

Plaintiffs advance several arguments against the finding that the language at issue is unambiguous, all of which fail. Like the lessors in *Catlett*, Plaintiffs argue that the phrase "immediately thereafter" show the parties' intent that the Leases either be renewed or cancelled immediately. Yet this interpretation would "add language to the lease," *id.* at *5, and it ignores the language in the rest of the provision. While the Leases do refer to the transaction being "immediately consummated," they say "nothing about said transaction becoming effective immediately." *Id.* To this end, "[t]here is a vast distinction between the parties entering immediately into a lease renewal and that renewal becoming effective immediately." *Id.* Here,

"[t]he lease contains no terminology to suggest that any agreed-upon renewal would become effective immediately." *Id.* Thus, Plaintiffs' "immediately thereafter" argument fails.

Plaintiffs also argue that they advance the only unambiguous interpretation and that, to the extent necessary, any ambiguities should be resolved against Triad and Chesapeake. But as the *Catlett* Court points out, Plaintiffs' interpretation requires adding language to the lease. For example, Plaintiffs argue that the above provision of Paragraph 14 is essentially a termination provision—lessees must comply or the lease ends, they argue. But no words "in any portion of the lease . . . discuss[] terminating the lease." For the Court to adopt Plaintiffs' interpretation, it would thus have to read "consummation of said transaction or termination of this lease," which contract interpretation forbids. *Id.*

Plaintiffs' interpretation also stands in conflict with other provisions in the Leases. Section 3 of the Leases provides that the primary term "shall remain in force" for a term of, for example, three years. *See* doc. 44-2 ¶ 3. And section 4 grants the lessee the option to extend the primary term for another term of three years. *Id.* Yet Plaintiffs argue that Paragraph 14 might allow them to "terminate the lease at *any time*." *Catlett*, 2012 WL 5364259, at *5. This is problematic in several ways. First, sections 3 and 4 do not reference Paragraph 14, and Paragraph 14 does not reference them. Plaintiffs' interpretation would thus "render meaningless the mandatory language, 'shall remain in force,' in section 3." *Id.* Second, Plaintiffs' interpretation would also add language to the lease. Specifically, it would change section 3 to read that "'the lease shall remain in force for a primary term of three (3) years unless Lessor receives a bona fide offer and Lessee declines to match said offer.' However, that is not the language negotiated by the parties, and the Court declines to add words to the parties' agreement." *Id.*

Finally, Plaintiffs point to several examples of terms and evidence outside of the Leases to support their interpretation of the contract. As one example, they commonly refer to Paragraph 14 as a "Fair Market Value Provision," and argue that the provision was pitched to them as a "promise to allow [them] to take their lease to fair market value," doc. 44 at 3. As another, they offer the affidavit of Ronald Davis, a former land agent for Anschutz who was responsible for obtaining oil and gas leases for landowners in Carroll County and Columbiana County. *See* doc. 48-1 ¶¶ 2–3. Mr. Davis avers that, based on his training, his understanding of Paragraph 14 matches that of Plaintiffs. *See id.* ¶ 6. Plaintiffs also allege, with no support from the record, that the amount of consideration they received in exchange for the Leases was inadequate, or "trifling." Doc. 44 at 1.

The parol evidence prevents consideration of Plaintiffs' outside evidence. It applies "only to integrated writings," and it stands for the following proposition: "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27, 734 N.E.2d 782, 788 (Ohio 2000) (quoting 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4). Plaintiffs do not allege fraud or mistake with respect to the contract. And the Court sees nothing to rebut the presumption that the contract at issue is an integrated writing. *See Bellman v. Am. Internatl. Group*, 113 Ohio St.3d 323, 326, 865 N.E.2d 853, 857 (Ohio 2007) ("A contract that appears to be a complete and unambiguous statement of the parties' contractual intent is presumed to be an integrated writing."). Thus, it cannot consider Plaintiffs' arguments or affidavit regarding outside conditions as they apply to an unambiguous provision. *See Catlett*, 2012 WL 5364259, at *6. Finally, regarding the claims of inadequate consideration, the Court "may not inquire into

the adequacy of consideration, which is left to the parties." *Williams v. Ormsby*, 31 Ohio St. 3d 427, 430, 966 N.E.2d 255, 259 (Ohio 2012). Courts may look into whether consideration exists at all, *see id.*, but Plaintiffs do not make this argument.

### e. "Any lease or option to lease the Leasehold, in whole or part, granted by Lessor in contravention of the purposes of this paragraph shall be deemed null and void."

The Court finds this part of Paragraph 14 unambiguous. If Plaintiffs "enter into a lease or option to lease that violates [Triad's or Chesapeake's] rights in the current lease or its right to renew, the new lease or option is void." *Catlett*, 2012 WL 5364259, at *6.

### f. Summary

The parties submitted motions for summary judgment for a declaratory judgment as to Count 1 of Plaintiffs' complaint, regarding the interpretation and effect of Paragraph 14. Based on the above analysis and conclusions, the Court finds Paragraph 14 of the Leases at issue unambiguous. It grants Triad—and Chesapeake, to the extent that Chesapeake's oil and gas interests are implicated in the Leases at issue—"a right to match a bona fide offer and renew the lease." *Catlett*, 2012 WL 5364259, at *6. If the lessee chooses not to match the offer, the current lease continues until it ends under the terms of the contract. To be sure, Plaintiffs can accept a third-party offer while the current Leases at issue remain valid. Doing so, however cannot deprive Triad "of its *current* rights in the lease." *Id.*; *see also Koonce*, doc. 94-3 at 9. *But see Koonce*, doc. 94-3 at 9 ("provided that the replacement lease cannot be effective before the 'primary term' ends."). Contrary to Plaintiffs' claims, Paragraph 14 says nothing about the Leases terminating, being cancelled, or otherwise ending if the lessee does not match that offer.

In short, Paragraph 14 does not allow Plaintiffs to terminate the valid Leases, and Triad has not breached the contract with respect to the Wileys, the only plaintiffs to receive a third-

party offer. For these reasons, and those stated above, the Court grants Triad's and Chesapeake's motions for summary judgment, and denies Plaintiffs' motion for summary judgment.

## C. Tolling of the Leases

In response to this lawsuit, Triad moved the Court to issue a judgment tolling the period of the Leases from the date of service to the date of final disposition of Plaintiffs' claims, including any appellate proceedings. Doc. 47. At that time, the Court found that any decision as to tolling would be premature given that the underlying merits of the case remained unresolved. Doc. 88. Triad then submitted a Motion to Alter this Court's June 5, 2013 Order, in which it urged the Court to reconsider its previous determination as to tolling. Doc. 93. The Court found reconsideration or alteration of its previous order unnecessary, and noted that it would address the issue when it resolved the underlying merits of the case. Doc. 126. Having done so, the Court now turns to the matter of tolling.

Triad makes several arguments for why the Court should issue a judgment tolling the period of the Leases. The company maintains that the uncertainty concerning the status of the Leases prevents it from investing in the leased properties. Consequently, it asks the Court to toll the Leases to ensure that it receives the full benefit of the Leases. Triad also submitted a Motion for Urgent Non-Oral Hearing with regard to tolling. Doc. 78. There, Triad maintained, and submitted supporting evidence, that some of the Leases at issue will expire soon, in November of 2013. It thus argued that it could lose its rights under the Leases even if it ultimately succeeded in this action.

The Court grants Triad's Motion for Judgment Tolling the Term of Plaintiffs' Leases with respect to the primary terms and any extensions of the primary terms of the leases at issue. It does so from the date of service to the date of final disposition of Plaintiffs' claims. And it

does so for several reasons. First, while it appears that only one Ohio court has squarely addressed the issue, relevant Ohio case law favors the equitable tolling of an existing oil and gas lease term where the lessors have challenged the validity of the lease. In *Three Waters, LLC v. Northwood Energy Corporation*, No. 2012-042, ¶ 4 (Monroe Cnty. Ct. Com. Pl. June 12, 2012) (included in the record, *see* doc. 48-1), the plaintiff sued the defendant challenging the validity of four oil and gas leases. The defendant requested judgment declaring the leases valid, and sought an order tolling the five-year lease term during the pendency of litigation. *Id.* ¶ 4. After finding the leases valid, the *Three Waters* court tolled the term of the lease from "the date of service of Plaintiff's Complaint until final disposition of Plaintiff's claims, including pendency of any appeal."[3] *Id.* ¶ 18. It did so for reasons of fairness, as the defendant had already paid and bargained for the term of its lease—a period disrupted by the plaintiff's suit. *See id.* The Court finds the reasoning of the *Three Waters* Court both sound and applicable in this case.

Second, *Three Waters* accords with relevant case law outside of Ohio with regard to equitable tolling. As these cases indicate, the "general rule" is that "[w]hen a lessor actively asserts to a lessee that his lease is terminated or subject to cancellation, the obligations of lessee to lessor are suspended during the time such claims of forfeiture are being asserted." *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1341 (10th Cir. 1982) (tolling an oil and gas lease where plaintiff lessors sued defendant lessees); *see also Barby v. Cabot Petroleum Corp.*, 944 F.2d 798, 799 (10th Cir. 1991) ("Litigation commenced by the lessor asserting the cancellation of a lease is certainly such a challenge and will result in the suspension of the lessee's duties under the lease. This suspension of duties continues throughout the course of the litigation, until the challenge to the lessee's title is finally resolved." (citations omitted)); *Morrison Oil & Gas Co. v. Burger*, 423

---

[3] In the event of an appeal, the appellate court is in the better position to determine if further tolling is appropriate.

F.2d 1178, 1182 (5th Cir. 1970) (same). The Court finds no reason to deviate from the general rule established by circuits with experience in dealing with oil and gas lease issues.

Third, tolling is appropriate as a matter of equity. As the *Three Waters* Court noted, the lessee in this situation has already bargained for and paid for a certain term of time for which the Leases are valid. And because the Leases are indeed valid, Triad should not be penalized for the unsuccessful lawsuit of the other party to the Leases. Further, courts impose equitable tolling "to restore the parties to the position they occupied originally." *Jicarilla*, 687 F.2d at 1341. Here, tolling the Leases from the date of service to the date of final disposition of Plaintiffs' claims, including any appellate proceedings, does just that. Finally, a different rule would create the incentive for vexatious litigation by parties unhappy with a currently valid lease. *See Barby*, 944 F.2d at 799.

### IV. THE REMAINING COUNTS AND PENDING MOTIONS

After the Court's Order on August 8, 2013, Counts 1, 3, and 4 remained from Plaintiffs' complaint. The resolution of Count 1 in favor of Triad resolves Counts 3 and 4 as well. In Count 3, Plaintiffs brought a claim for anticipatory breach and repudiation for what they termed as Triad's failure to honor the fair market value provision. *See* doc. 43 ¶ 60. In granting Triad's and Chesapeake's motions for summary judgment, however, the Court has held that the lessee— here Triad—has no obligation to match a third-party offer. Thus, not accepting the third-party offer does not, as a matter of law, amount to anticipatory breach or repudiation. The same logic applies to Count 4, where Plaintiffs bring a claim for unjust enrichment. *Id.* ¶ 67. Under Ohio law, "[a]bsent bad faith, fraud, or some other illegality, an equitable action for unjust enrichment cannot exist where there is a valid and enforceable written contract." *Kwikcolor Sand v. Fairmount Minerals Ltd.*, No. 96717, 2011 WL 6775580, at *3 (Ohio Ct. App. Dec. 22, 2011).

In resolving Count 1, the Court held that Paragraph 14 is unambiguous, and that the contract is thus valid. Without any indication of bad faith, fraud, or any other illegality, Plaintiffs' claim for unjust enrichment also fails as a matter of law.

Several additional motions remain pending, all relating to discovery. They are: (1) Triad's Motion to Quash Plaintiffs' Subpoenas, Documents 61, 62, 63, 64 and 65, doc. 69; (2) Motion to Quash Subpoena by Movant Anschutz Exploration Corporation, doc. 77; (3) Triad's Motion to Compel Plaintiffs to Answer Discovery Requests, doc. 125; and (4) Plaintiffs' Motion to Compel Production of Documents, doc. 127. These motions are denied as moot given the Court's resolution of the motions for summary judgment as to Count 1—and, subsequently, as to the Counts 3 and 4—in favor of Triad and Chesapeake.

## V. CONCLUSION

For the reasons stated above, Triad's Cross-Motion for Summary Judgment on Count 1 of Plaintiffs' second amended complaint is **GRANTED**. Doc. 52. Chesapeake's Motion for Summary Judgment on the same count is also **GRANTED**. Doc. 94. Triad's Motion for Judgment Tolling the Term of Plaintiffs' Leases is **GRANTED** in accordance with the parameters set forth above. Doc. 47. Plaintiffs' Motion for Summary Judgment on Count 1 is thus **DENIED**. Doc. 44. And the Court **DENIES AS MOOT** the remaining pending motions. Doc. 69; doc. 77; doc. 125; doc. 127. The Clerk is **DIRECTED TO ENTER JUDGMENT** in accordance with opinion and order.

**IT IS SO ORDERED.**

9-26-2013
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**